IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CR3019 |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER G. DIGIORGIO, | ) | REPORT AND RECOMMENDATION |
| DOMINICK C. DIGIORGIO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The defendants have filed motions to suppress all evidence obtained as a result of the stop and search of the silver 2008 Chevrolet Impala they occupied on January 31, 2008. Filings 18 and 20. The defendants claim Nebraska State Patrol Trooper Paul Hazard lacked probable cause to initiate a traffic stop of their vehicle. Defendant Christopher DiGiorgio further claims his bag in the vehicle trunk was unlawfully searched without a warrant, probable cause, or Christopher DiGiorgio's consent.

PROCEDURAL HISTORY

An evidentiary hearing was held on May 6, 2008. See filings 33 (audio file) and 39 (transcript). After reviewing Christopher DiGiorgio's motion to suppress and supporting brief, the court noted that the following issues raised by this defendant, and supported by evidence offered at the hearing, were never briefed by the government:

•   Dominick DeGiorgio consented to the search of the vehicle. However, he also advised the trooper that he owned the suitcase and the passenger, Christopher DiGiorgio, owned the bag in the trunk. See ex. 2, (in car DVD), at 19:40-41.

- Dominick DeGiorgio did not give the trooper permission nor did he consent to Trooper Hazard's search of Christopher DiGiorio's bag.

- Dominick DeGiorgio did not have the authority to give consent to search Christopher DiGiorgio's bag.

- Trooper Hazard never requested Christopher DiGiorgio's consent to search his bag.

- Christopher DiGiorgio never consented to the search of his bag.

- Christopher DiGiorgio had no reasonable way to object to the officer's search of his bag since the officer refused to respond to his questions and locked him in the back of the officer's patrol vehicle during the search.

- Trooper Hazard lacked probable cause to open and search Christopher DiGiorgio's bag.

Filing 37.

The court entered an order on May 23, 2008 requiring the government to file a supplemental brief addressing these specifically identified legal and factual issues, further notifying the government that "[a]ny issues not briefed by the government as required under this order will be deemed conceded by the government." Filing 37, p. 3, ¶ 1. The purpose and intent of the court's order was not only to afford the government an additional opportunity to address Christopher DiGiorgio's arguments,[1] but to solicit the parties' assistance in correctly

---

[1]The court specifically notes that the identified legal and factual issues were raised by Christopher DiGiorgio's initial brief filed before the evidentiary hearing, yet the government did not respond to these issues in its pre-hearing brief. The court's order dated May 23, 2008 therefore afforded the government a second opportunity to research and brief the issues raised by Christopher DiGiorgio's motion.

2

analyzing legal, factual, and evidentiary issues not frequently
encountered on motions to suppress.

In response to the court's order, the government filed a
six-page brief containing only four pages of legal and factual
analysis, half of which reiterated arguments it had already made
in its pre-hearing brief.  Filing 40.  As explained in more
detail below, the cases cited by the government provided, at
most, limited assistance in determining the issues currently
before the court.  Christopher DiGiorgio's responsive brief cited
very little law, and focused on outlining this defendant's
version of the relevant facts.  Filing 41.

FACTUAL FINDINGS

Trooper Hazard has been a law enforcement officer for the
Nebraska State Patrol for five years.  His general duties
included traffic enforcement.  No evidence was offered concerning
his training and experience in drug interdiction and
identification.  Specifically, no evidence was offered explaining
this officer's knowledge concerning the chemicals commonly used
for manufacturing illegal drugs, or his background or ability to
identify the odor of illegal drugs, or the precursor chemicals
used during the manufacturing process.  See filing 39, pp. 3-4.

On the evening of January 31, 2008, Trooper Hazard was using
radar to clock the speed of motorists traveling eastbound near
mile marker 271 on Interstate 80 in Buffalo County, Nebraska.
The posted speed limit at this location was 75 miles per hour.

Trooper Hazard's patrol vehicle was parked on the right
shoulder of the eastbound lanes facing eastbound.  He was

3

watching the traffic approaching from the rear of his vehicle
through his side mirror, and checking the speed of these vehicles
with the rear radar antenna mounted on his patrol vehicle.  The
officer had tested the calibration of his radar equipment,
including the rear antenna, at the beginning of his shift that
day, and he tested it again at the end of his shift.  The radar
passed both calibration checks.  Filing 39, pp. 6-7; 15-16.

     At approximately 7:26 p.m., Trooper Hazard observed an
eastbound vehicle in the left lane passing a semi-truck.  The
digital reading on the officer's radar equipment indicated the
semi truck was traveling 73 miles per hour, and the vehicle in
the left passing lane was traveling 81 miles per hour.  Trooper
Hazard activated his emergency lights and initiated a traffic
stop of the passing vehicle for speeding.  Filing 39, pp. 5-7,
17-20.  The defendants promptly pulled over to the side of the
road, and the officer parked behind them.  The events occurring
during the traffic stop were recorded by the trooper's in-car
camera.  Filing 39, pp. 13-14, 20-21; ex. 2.

     Trooper Hazard exited his vehicle and approached the
passenger side of the defendants' vehicle.  Defendant Dominick
DiGiorgio was the driver; defendant Christopher DiGiorgio was the
front seat passenger.  There were no other vehicle occupants.

     The officer asked Dominick DiGiorgio to produce his driver's
license and the vehicle registration.  Dominick DiGiorgio
produced a New York driver's license.  Trooper Hazard then
noticed the vehicle, a silver Chevy Impala, was a rental vehicle,
and he asked to see the rental agreement.  Filing 39, pp. 7-8;
ex. 2, 19:26:50-19:27:13.  Dominick DiGiorgio handed the officer
the rental agreement, which stated Dominick DiGiorgio had rented

4

the vehicle from Budget Car Rental in Phoenix on January 30, 2008, and he was scheduled to return the vehicle to the rental company's location at the John F. Kennedy International Airport ("JFK") in New York City on February 2, 2008.  Filing 39, pp. 8-9, 25; ex. 1.

Trooper Hazard asked Christopher DiGiorgio for identification.  While Christopher DiGiorgio was looking for his driver's license, the officer asked him questions regarding the origin of the defendants' trip.  Christopher DiGiorgio responded that he and Dominick DiGiorgio were originally in Arizona and had stayed in Colorado for a night.  Trooper Hazard asked why they were in a hurry, explaining they were speeding while passing the semi truck.  Christopher DiGiorgio responded that they had the "what you call it," (presumably cruise control), set.  The officer asked who had rented the car, and Christopher DiGiorgio indicated Dominick DiGiorgio was the renter.  Christopher DiGiorgio was still having trouble finding his driver's license, and Dominick DiGiorgio, who had exited the vehicle and was now standing on the roadway, asked for his stocking cap because his head was getting cold.  The officer therefore instructed Dominick DiGiorgio to have a seat in the officer's vehicle, and told Christopher DiGiorgio to continue looking for his identification while the officer spoke with Dominick DiGiorgio in the patrol vehicle.  Ex. 2, 19:27:30-19:28:45.

Shortly thereafter, Christopher DiGiorgio delivered his driver's license to the officer while the officer was seated with Dominick DiGiorgio in the patrol vehicle.  After the officer received the driver's license, he told Christopher DiGiorgio to return to the defendants' vehicle and wait.  Christopher

DiGiorgio complied with the officer's instructions.  Ex. 2,
19:29:20-29:40

     While in the vehicle with Dominick DiGiorgio, the officer
asked why the defendants were in a hurry, and stated they were
speeding while passing the semi truck.  Dominick DiGiorgio stated
he was going about 73 miles per hour, and had the cruise control
set at 72 miles per hour.  He acknowledged that he rented the
car, and in response to the officer's questions, stated they were
coming from Arizona, had been in Phoenix seeing a friend, and had
also traveled to Tuscon to see another friend and to New Mexico
to get tattoos.  Ex. 2, 19:28:45-19:30:00.  The officer contacted
dispatch and asked for criminal history information for both
defendants.  The officer asked who the passenger was, and
Dominick DiGiorgio stated Christopher DiGiorgio was his brother.
Ex. 2, 19:30:00-19:31:15.

     Trooper Hazard stated he would be issuing a warning for
speeding, explaining that the vehicle was going 81 miles per hour
while passing the truck.  Ex. 2, 19:31:23-31:42.  While awaiting
a response from dispatch, the officer asked additional questions
about the purpose and itinerary of defendants' trip.  Dominick
DiGiorgio stated he had been in Phoenix for three days, and was
trying to get Superbowl tickets.  He stated he flew to Phoenix,
but his brother had driven there four or five days before
Dominick DiGiorgio flew down.  Dominick DiGiorgio explained that
he works in a business that books railroad cars.  The trip was,
in part, a business trip for Christopher DiGiorgio, but it was a
pleasure trip for Dominick DiGiorgio.  When asked why they were
not flying back to New York, Dominick DiGiorgio stated they
wanted a cross-country trip.  Ex. 2, 19:31:42-33:30.

Trooper Hazard exited the vehicle to speak with Christopher
DiGiorgio and return his driver's license.  In response to the
officer's questions concerning the itinerary and purpose of their
trip, Christopher DiGiorgio stated he and his brother had both
flown to Arizona to visit friends, but they flew separately and
Christopher DiGiorgio had arrived in Phoenix before his brother.
He stated he was in Phoenix for three or four days, and stayed in
Arizona longer than originally intended because they went to New
Mexico to get tattoos.  He stated he and his brother were in
business together, and Dominick DiGiorgio works for United
switching signals.  Ex. 2, 33:32-35:40.

Trooper Hazard returned to the patrol vehicle.  He promptly
contacted dispatch to determine if a criminal history report had
been radioed while the officer was outside his vehicle.  The
officer was advised to stand by.  Trooper Hazard was telling
Dominick DiGiorgio he would receive a warning ticket when
dispatch called with the criminal history report.  Dominick
DiGiorgio had no criminal history, but Christopher DiGiorgio had
a positive criminal history.  However, no evidence was offered
identifying the specific offenses included within Christopher
DiGiorgio's criminal history.  Ex. 2, 19:36:30-37:54.  Trooper
Hazard asked Dominick DiGiorgio about his brother's criminal
history and supervisory status.  Dominick DiGiorgio responded
that Christopher DiGiorgio had been in the wrong place at the
wrong time, the event had occurred a long time ago, he was home
now, and he was not on probation or parole.  Ex. 2, 19:38:00-
38:33.

Trooper Hazard returned Dominick DiGiorgio' driver's license
and rental agreement, and gave Dominick DiGiorgio a warning
ticket.  The officer stated, "He's got his ID back.  That's all I

got for you, alright.  Take care, Dominick." Dominick DiGiorgio
responded, "Thank you.  Take care," and he began to exit the
vehicle.  Ex. 2, 19:38:20-34.

     As Dominick DiGiorgio was exiting, the officer said, "Hey
Dominick, I got a couple questions for you here if you've got a
second."  Dominick DiGiorgio responded, "Yeah," and sat back
down.  Filing 39, p. 10; ex. 2, 19:38:35-39.  The officer stated
that part of his job included criminal interdiction, which he
explained meant stopping illegal activity on the highways.  He
stated that after talking with the two defendants, things were
not making sense.  When asked to explain what was not making
sense, the officer specifically noted that contrary to Dominick
DiGiorgio's statement, Christopher DiGiorgio stated he flew to
Arizona.  After reminding Dominick DiGiorgio that part of the
officer's job was determining if anything illegal was being
transported on the highways, Trooper Hazard asked if illegal
drugs of any kind, large amounts of U.S. currency, marijuana,
cocaine, heroin, or methamphetamine were in the vehicle.
Dominick DiGiorgio said "no" or "nothing" in response to each of
these questions.  Trooper Hazard asked, "Can I search your
vehicle?"  Dominick DiGiorgio responded, "Sure.  Ex. 2, 19:38:39-
39:15; filing 39, pp. 10-11.

     The officer instructed Dominick DiGiorgio to "sit tight
here," and began completing the upper portion of the Nebraska
State Patrol "Permission to Search" form.  While completing the
form, the officer asked Dominick DiGiorgio, "All the bags in the
car yours and his?"  Dominick DiGiorgio responded, "Yes."  Ex. 2,
39:15-39:25.  Dominick DiGiorgio then asked about the scope of
the officer's intended vehicle search.  The officer clarified
that he intended to search the entire vehicle and everything in

8

it, promptly adding, "I'm going to talk to him [meaning
Christopher DiGiorgio] too."  Ex. 2, 39:25-39:40; filing 39, p.
27.

     As the officer was completing the consent to search form,
Christopher DiGiorgio began to exit the defendants' vehicle.
Trooper Hazard instructed Christopher DiGiorgio to remain in the
defendants' vehicle, and by questioning Dominick DiGiorgio,
confirmed that there were no weapons in the vehicle.  Ex. 2,
39:50-40:10.

     Trooper Hazard read the NSP consent to search form to
Dominick DiGiorgio aloud.  The form includes the statement, "I am
giving this written permission freely and voluntarily, without
any threats or promises made to me, and understanding that I have
the right to refuse to permit this search," followed by a
signature line.  The officer told Dominick DiGiorgio that if he
understood and agreed to everything in the form, Dominick
DiGiorgio just needed to sign by the "x."  Dominick DiGiorgio
signed the consent to search form.  Filing 39, pp. 10-12; ex. 2,
40:15–40:54; ex. 3.

     Trooper Hazard asked how the trunk was loaded.  Dominick
DiGiorgio told the officer that both he and his brother had bags
in the vehicle.  Dominick DiGiorgio explained that the bag in the
back seat was his, and that the defendants each had a separate
bag in the trunk.  He stated the suitcase in the trunk was his,
and the duffle bag was his brother's.  Filing 39, pp. 26, 28-29,
46-47; ex. 2, 40:50-41:02.  The officer advised Dominick
DiGiorgio to sit tight, and he exited the vehicle to speak with
Christopher DiGiorgio at the defendants' vehicle.  Ex. 2, 41:05-
41:15.

Trooper Hazard exited the patrol vehicle and spoke to
Christopher DiGiorgio.  As the officer approached, Christopher
DiGiorgio exited the defendants' vehicle.  The officer told
Christopher DiGiorgio that his brother had given consent to
search the vehicle, and asked if there was anything in the
vehicle that the officer should know about.  Christopher
DiGiorgio nonchalantly shrugged and said, "No." Filing 39, p. 12,
27; ex. 2, 41:15-41:23.  The officer did not ask Christopher
DiGiorgio if any of the bags in the vehicle were his, or whether
he would consent to a search of his bag.  Filing 39, p. 28, 30.

     The officer told Christopher DiGiorgio, "I'm going to put
you in my car, okay?  You're not in any trouble so just relax."
After pat-searching Christopher DiGiorgio for weapons, the
officer stated, "Go ahead and step back here for a second, I'll
talk to you in a second, alright?."  Christopher DiGiorgio said,
"I know, but can I ask you why?  The officer responded that he
had talked to Dominick DiGiorgio, and "I'm just going to have you
sit back here to stay warm, okay?"  Christopher DiGiorgio
responded, "Alright," and was told by the officer to "have a
seat" in the back of the officer's patrol vehicle.  Ex. 2,
19:41:23-41:45; filing 39, pp. 28-30, 44-45.

     Trooper Hazard then began searching the vehicle trunk.  When
he opened the trunk, the officer saw a suitcase and a duffle bag,
and immediately noticed "a chemical odor . . . emitting from the
bag."  The officer lifted the suitcase, and felt the bag.  There
was no outside identification on the duffle bag.  Trooper Hazard
removed the suitcase from the trunk and attempted to lift the
duffle bag.  He noticed that the duffle bag was "extremely
heavy."  Trooper Hazard opened the duffle bag and removed papers
and undergarments from the bag.  The papers in the bag were

10

receipts issued to "C, G DiGiorgio" for a one-night motel stay in Tolleson, Arizona.  The officer found suspected illegal drugs hidden under the receipts and undergarments.  Filing 39, pp. 13, 30-31, 37-38, 47; ex. 2, 19:41:45-42:22; exs. 102-104.

The officer's patrol vehicle was parked behind the defendants' vehicle, and the defendants were able to watch the officer as the vehicle was searched.  Ex. 2.  While seated in the patrol vehicle, Dominick DiGiorgio could exit the front seat, but Christopher DiGiorgio was locked in the back seat and could not exit absent the door being opened from outside the vehicle. Filing 39, pp. 29-30, 32.  However, as clearly evidenced by the in-car camera recording, the defendants were able to converse while seated together in the patrol vehicle.  Immediately after the Christopher DiGiorgio entered the vehicle, and for the eleven seconds it took for the officer to unlatch the trunk from inside the vehicle's passenger compartment, Christopher and Dominick began comparing the description of the trip they had each provided to the officer.  Ex. 2, 19:41:46-41:57.

Dominick ended that colloquy by announcing, "It's done. Chris."  Christopher DiGiorgio responded, "Why?," and Dominick DiGiorgio explained, "Cuz, he's searching the trunk."  Ex. 2, 19:41:57-42:00.  Less than twenty seconds later, the officer had opened the duffel bag.  Ex. 2, 19:42:18.  Although Christopher DiGiorgio never asked Dominick DiGiorgio to tell the officer to stop searching, (filing 39, p. 46), and neither defendant objected to the search or asked any questions while the search was being conducted, (filing 39, p. 13, 46), the entire vehicle search lasted less than forty seconds.  Ex. 2, 19:41:45-42:22.

11

DISCUSSION

Dominick and Christopher DiGiorgio both argue that Trooper Hazard lacked probable cause to initiate a traffic stop of their vehicle.  Filings 19 and 21.  Christopher DiGiorgio also argues that any evidence found in his duffel bag must be suppressed because the officer did not have a warrant, probable cause, or a valid consent to consent search the bag.  Filing 21.  The government claims Christopher DiGiorgio has failed to show any reasonable expectation of privacy in the searched bag, lacks standing to assert his Fourth Amendment rights were violated by the search of the duffel bag, and therefore the only issue is whether Trooper Hazard conducted a valid traffic stop.  Filing 29.

This report and recommendation will first discuss the issue common to both defendants; that is, whether Trooper Hazard lacked probable cause to stop the defendant's vehicle.  As to Christopher DiGiorgio's claim challenging the search of the duffel bag, the standing issue raised by the government is a threshold issue that must be resolved before determining the merits of his challenge to the duffel bag search.

For the reasons explained below, I conclude the traffic stop was valid, and as to this issue, the defendants' motions to suppress should be denied.  However, the evidence presented supports Christopher DiGiorgio's claim that he had a legitimate expectation of privacy in the contents of the duffel bag.  I further find Dominick DiGiorgio had no actual or apparent authority to consent to the search of that bag, Christopher DiGiorgio did not consent to the search of the bag, and the officer lacked probable cause to search the bag.  Therefore, I

12

conclude that as to the search of the duffel bag, Christopher DiGiorgio's motion to suppress should be granted.

A.   The Traffic Stop.

"A traffic stop constitutes a seizure under the Fourth Amendment. . . .  An officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment." U.S. v. Peralez, 2008 WL 2038805, 3 (8th Cir. May 14, 2008) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979), and Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977)).  "[I]t is well established that a traffic violation--however minor--creates probable cause to stop the driver of a vehicle." U.S. v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007).  See also, U.S. v. Wright, 512 F.3d 466, 471 (8th Cir. 2008); U.S. v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); U.S. v. Herrera-Martinez, 354 F.3d 932, 934 (8th Cir. 2004); U.S. v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002); U.S. v. Alcantar, 271 F.3d 731, 736 (8th Cir. 2001).

"Courts are not to consider the motive for a stop as long as the reason for the stop is valid." U.S. v. Jones, 275 F.3d 673, 680 (8th Cir. 2001).  "An otherwise constitutional traffic stop is not invalidated by the fact that it was 'mere pretext for a narcotics search.'" Wright, 512 F.3d at 471 (8th Cir. 2008)(quoting U.S. v. Williams, 429 F.3d 767, 771 (8th Cir. 2005)).  "[S]o long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop." Alcantar, 271 F.3d at 736.

13

Trooper Hazard observed and clocked the defendants' vehicle traveling in excess of the posted speed limit.  Exceeding the speed limit is a legitimate basis for conducting a traffic stop. U.S. v. Stapleton, 10 F.3d 582, 583 (8th Cir. 1993).  The traffic stop of defendants' vehicle did not violate the Fourth Amendment.  U.S. v. Coney, 456 F.3d 850 (8th Cir. 2006) (holding officer had probable cause to conduct a traffic stop where his radar clocked the vehicle traveling 81 miles per hour in a 75-mile-per-hour zone and the officer had tested the radar's calibration earlier that morning).

Since the only claim raised by Dominick DiGiorgio is whether the traffic stop was valid, his motion to suppress should be denied in its entirety.  To the extent Christopher DiGiorgio's motion challenges the traffic stop, his motion should likewise be denied.

B.   Search of the Duffel Bag.

1.   Christopher Digiorgio's Legitimate Expectation of Privacy.

Christopher Digiorio's motion does not challenge the search of the vehicle Dominick DiGiorgio had rented and was driving at the time of the traffic stop.  Rather, Christopher DiGiorgio's motion is narrowly tailored and challenges the search of only the duffel bag located in the trunk of the vehicle.  As to its claim that Christopher DiGiorgio lacks standing to challenge the search of the duffel bag, the government argues:

> Fourth Amendment rights are personal, and a defendant moving to suppress a search has the burden of proving a reasonable expectation of privacy in the area searched. United States v. Gomez, 16 F.3d 254, 256 (8th Cir.

14

> 1994).  A mere passenger who has no ownership rights in
> a vehicle lacks standing to challenge a search of that
> vehicle.  United States v. Barragan, 379 F.3d 524,
> 529-30 (8th Cir. 2004).  Since the Defendant
> Christopher Digiorgio was a passenger in the vehicle,
> and the vehicle was rented by Dominick Digiorgio, the
> defendant has no standing to contest the search of the
> vehicle.

Filing 29, p. 2.  See also, filing 40, p.2.


The government further argues that Christopher DiGiorgio
abandoned the duffel bag because the bag lacked identifying
marks; when asked if there was anything in the vehicle the
officer should know about, Christopher DiGiorgio failed to state
he owned the duffel bag; and Christopher DiGiorgio walked away
from the vehicle and the luggage before the search began.


Fourth Amendment rights are personal rights that cannot be
asserted vicariously.  Barragan, 379 F.3d at 529-30 (citing Rakas
v. Illinois, 439 U.S. 128, 133-34 (1978)).  A defendant seeking
to suppress evidence for alleged violations of the Fourth
Amendment must demonstrate:  (1) a subjective expectation of
privacy in the place searched; and (2) that this expectation is
one that society is prepared to recognize as objectively
reasonable.  U.S. v Green, 275 F.3d 694, 699 (8th Cir. 2001).
"If a defendant fails to prove a sufficiently close connection to
the relevant places or objects searched he has no standing to
claim that they were searched or seized illegally."  Barragan,
379 F.3d at 529.  "The ownership, possession and/or control of
the area searched or item seized is relevant to the analysis."
Green, 275 F.3d at 699.


As supported by the cases cited by the government, a vehicle
passenger generally has no legitimate expectation of privacy in

an automobile that he does not own, did not rent, was not driving, or was driving without proper authorization or permission.  Barragan, 379 F.3d at 530)(holding passenger who lacked any ownership interest lacked standing to object to the search of the vehicle); Green, 275 F.3d at 699 (holding the defendant, a passenger in the searched vehicle who did not own the vehicle, lacked standing to challenge the search, particularly where the vehicle owner consented to the search); U.S. v. Best, 135 F.3d 1223, 1225 (8th Cir. 1998)(holding a defendant with permission to use a vehicle has standing to object to a vehicle search); U.S. v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995)(holding the defendant lacked standing to challenge the search of a rental vehicle leased by another where the defendant presented no evidence of permission to use the vehicle); U.S. v. Gomez, 16 F.3d 254 (8th Cir. 1994)(holding a defendant who was driving a vehicle without the owner's consent lacked standing to object to the alleged illegal search of vehicle); U.S. v. Macklin, 902 F.2d 1320, 1330 (8th Cir. 1990)("[T]o have a legitimate expectation of privacy by way of a possessory interest, a defendant must have possession of the vehicle and the keys.").

Christopher DiGiorgio did not own or rent the Chevrolet Impala, and he was not driving it at the time of the traffic stop.  There is no evidence that Christopher and Dominick DiGiorgio shared joint authority over or access to the vehicle. The mere existence of a passenger's luggage in the trunk of the car is insufficient to convey to the passenger a reasonable expectation of privacy in the trunk itself.  U.S. v. Martinez, 983 F.2d 968, 973 (10th Cir. 1992).  Christopher DiGiorgio therefore lacks standing to object to the search of the trunk area of the stopped vehicle.

16

However, Christopher DiGiorgio claims he has standing to object to the officer's act of opening and searching his duffel bag located in the vehicle's trunk.[2]  The government's briefs, and the cases cited therein, do not discuss whether and under what circumstances a passenger has standing to object to the search of the contents of his luggage located in another's vehicle.  At the close of the evidentiary hearing, the government orally argued that the defendant submitted no evidence stating he owned the duffel bag or its contents, and therefore the defendant failed to show he had a legitimate expectation of privacy in the bag.

Trooper Hazard testified that Dominick DiGiorgio told the officer that each defendant had a bag in the trunk.  Exhibit 2, the in-car camera recording of the traffic stop, was received into evidence.  On the recording, Dominick DiGiorgio explains that the suitcase in the trunk was his, and the duffel bag belonged to Christopher DiGiorgio.  Ex. 2, 40:50-41:02.  The court can consider all evidence offered at a hearing, including that offered by the government, to determine whether a defendant has met his burden of proving standing.  Even in the absence of any statement by Christopher DiGiorgio at the time of the traffic stop, or the testimony of Christopher DiGiorgio at the evidentiary hearing, there is sufficient evidence of record supporting Christopher DiGiorgio's claim of an ownership or

---

[2]The court further notes that even when a defendant lacks a possessory or property interest in a searched vehicle or its contents, that defendant may still move to suppress evidence discovered as the fruit of his unlawful detention during the traffic stop.  Green, 275 F.3d at 699.  However, neither defendants' motion to suppress raises an unlawful detention claim.

17

possessory interest in the duffel bag.  U.S. v. Freire, 710 F.2d 1515 (5th Cir. 1983)(holding that even if the defendant did not possess his briefcase at time it was seized from an automobile, and even in the absence of the defendant's testimony claiming ownership, the defendant made a sufficient showing of standing where the passenger testified that the defendant owned the briefcase and provided instructions on how it was to be handled).

"The owner of a suitcase located in another's car may have a legitimate expectation of privacy with respect to the contents of his suitcase."  U.S. v. Buchner, 7 F.3d 1149, 1154 (5th Cir. 1993)(holding defendant had standing to object to the search of his luggage located in a vehicle rented by another).  Although the duffel bag had no identifying name tag, Christopher DiGiorgio's duffel bag was locked in the vehicle trunk and was zipped shut.  The duffel bag contained receipts provided to "C, G DiGiorgio," and underwear, and it can be reasonably inferred that the underwear, accompanied by a receipt in Christopher DiGiorgio's name, was Christopher DiGiorgio's.  It is reasonable for a person to expect that his underwear located in a zipped duffel bag in the locked trunk of an automobile is not going to be rifled through by even his brother, much less by a stranger.

Based on these facts of record, Christopher DiGiorgio manifested a subjective expectation of privacy in the bags, his expectation is one that society has recognized as reasonable. U.S. v. Edwards  242 F.3d 928, 937 (10th Cir. 2001)(holding the defendant passenger had standing to challenge the search of his personal luggage where the luggage contained the passenger's clothing and toiletries in addition to the contraband seized and was located within the trunk of the rental vehicle); U.S. v. Infante-Ruiz, 13 F.3d 498, 501 (1st Cir. 1994)(holding the

18

defendant did not abandon his briefcase by leaving it closed but unlocked in a locked vehicle trunk.)

Citing U.S. v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997), the government argues that Christopher DiGiorgio abandoned any interest in the duffel bag by leaving the Chevrolet Impala and sitting in Trooper Hazard's vehicle while the search was conducted.  In Tugwell, the baggage located in a bus was removed and subjected to a canine sniff.  The defendant watched the canine sniff from a distance, and when the canine alerted to the odor of illegal drugs emanating from his suitcase, the defendant exited the bus terminal and left his suitcase behind.

The facts and analysis supporting a finding of abandonment in Tugwell do not support the government's claim that Christopher DiGiorgio abandoned his duffel bag.  Christopher DiGiorgio did not leave his bag and begin walking down the interstate when the search began.  Rather, he sat in the patrol vehicle as instructed by Trooper Hazard, and his act of obeying this instruction cannot be interpreted as abandoning the duffel bag.

Although the government argues Christopher DiGiorgio abandoned the bag by failing to state he owned the bag in response to Trooper Hazard's questions, Trooper Hazard never asked Christopher DiGiorgio to identify the owner of the duffle bag.  The officer asked, "Anything in there I need to know about?"  Ex. 2, 41:15-41:23.  This question may elicit, but it certainly does not seek information concerning who owned the specific contents within the vehicle.  Christopher DiGiorgio's failure to identify his bag in response to this question cannot be interpreted as abandonment.

19

It is also worth noting that Christopher DiGiorgio wanted to speak to the officer about the intended search before the search began, and perhaps the ownership of the bags would have been discussed then, but that conversation never occurred.  Instead, the officer summarily dismissed Christopher DiGiorgio's request for a dialogue about the search and told Christopher DiGiorgio to sit in the patrol vehicle while the search was being conducted. Based on the totality of interactions between Christopher DiGiorgio and the officer, Christopher DiGiorgio was not afforded a reasonable opportunity to claim he owned the bag or, in the alternative, to deny ownership.

Christopher DiGiorgio did not abandon his duffel bag. Although he lacks standing to object to the search of the vehicle's trunk area, he did have a subjective expectation of privacy in the duffel bag located within that trunk, and his expectation is one that society is prepared to recognize as objectively reasonable.  Christopher DiGiorgio has standing to raise a Fourth Amendment challenge to Trooper Hazard's search of the duffel bag.

2.   Consent to Search the Duffel Bag.

Christopher DiGiorgio was not asked and did not consent to the search of his duffel bag.  He claims the search of the duffel bag was unlawful because Dominick DiGiorgio did not consent to the search, and he did not have actual or apparent authority to consent to a search of the duffel bag.  The government argues that Christopher DiGiorgio's silence when told his brother had consented to the search, and his acquiescence and failure to object while the search was conducted, indicates he impliedly and voluntarily consented to the search.  Filing 40, p.3.

20

The government's argument on this pivotal issue, stated in its entirety, is as follows:

> When a "third party with apparent authority gives unequivocal consent, and the defendant is present and fails to disclose a superior privacy interest and object to the search," an inference may be drawn "from his silence in the face of the impending search," that he has impliedly and voluntarily consented to that search.  United States v. Elam, 441 F.3d 601, 604 (8th Cir. 2006).  Christopher was informed by Trooper Hazard that his brother consented to the search of the vehicle immediately after the consent occurred, and failed to disclose a superior privacy interest of the object to the impending search.  Thus, if the Court were to find that Christopher had a reasonable expectation of privacy of the luggage in the vehicle, it can be inferred that he impliedly and voluntarily consented to that search.
>
> Moreover, during the search Christopher "made no effort to withdraw or limit the scope of his consent and did not protest in any manner the continuation of the search.  Therefore, it was  objectively reasonable for [Trooper Hazard] to continue searching and access the contents of the trunk."  United States v. Siwek, 453 F.3d 1079, 1085-86 (8th Cir. 2006).  See also United States v. Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2005)(holding that a consensual search was objectively reasonable where the individual could see much of the progress of the search and never objected to the search).
>
> Christopher argues when Trooper Hazard placed him in the backseat of the patrol car he was seized and had no reasonable way to object to the trooper's search.  "In context, this argument fails."  United States v. Coney, 456 F.3d 850, 858 (8th Cir. 2006).  Trooper Hazard testified it was a cold night in January and he wanted to give Christopher the option of staying warm during the search, which "could only be accomplished by asking him to sit in the backseat." (Tr. 12, 44:15-16.)  Coney, 456 F.3d at 858.  Trooper Hazard did not "order" Christopher to sit in the backseat, but "asked him if he would mind sitting in the backseat."  Id.  Christopher "complied" and was able to communicate with his brother, who was not locked in the patrol car and

21

had the ability to exit the patrol car and object to
the search.  (Tr. 46:8-17).  <u>Id</u>.

<u>Filing 40</u>, p.3.

     The government's argument begins with two assumptions:  1)
the officer's search of Christopher DiGiorgio's duffel bag was
within the scope of the consent granted by Dominick DiGiorgio;
and 2) Dominick DiGiorgio was a third party with authority to
provide this consent.  <u>Elam, 441 F.3d at 604</u>.  The government
never addresses the legal and factual basis for these
assumptions, and both issues were identified in the court's order
requiring additional briefing by the government.[3]

     a.   Scope of the Search.

     Dominick DiGiorgio told the officer that both he and his
brother had bags in the vehicle.  He thereafter consented to the
search of the vehicle, but before signing the permission to
search form, asked the officer to explain what would be searched.
The officer explained that he would search the entire vehicle and
all its contents, then stated he would also talk with Christopher
DiGiorgio, (ex. 2, 39:25-39:40), the clear implication being that
he would ask Christopher DiGiorgio for consent to search the
duffel bag.  Thereafter, Dominick DiGiorgio signed the consent to
search form.

_____

     [3]The court's order stated that "[a]ny issues not briefed by
the government as required under this order will be deemed
conceded by the government." <u>Filing 37</u>, p. 3, ¶ 1.  Therefore,
the undersigned could have deemed the scope of consent and
authority to consent issues raised by the defendant as conceded
by the government.  However, this report and recommendation
nonetheless addresses all the issues raised by Christopher
DiGiorgio's motion.

Under analogous facts, <u>Infante-Ruiz</u> held that the officer's search of a passenger's briefcase located in a vehicle trunk exceeded the scope of the driver's consent to search.   <u>Infante-Ruiz</u> explained:

> What leads us to hold that the scope of [the driver's] consent did not include defendant's briefcase, is that [the driver's] general permission to search the car and its trunk was qualified by [the driver's] further statement to the officer, before the latter opened and searched the briefcase, that the briefcase belonged to Infante.  Even though Infante was nearby, handcuffed in the squad car, the police officers never sought his permission to search his briefcase.  We do not think that it was "objectively reasonable," in these circumstances, for the officer to believe that [the driver's] prior consent to search the vehicle and its trunk encompassed opening that particular briefcase, later clearly identified by [the driver] as belonging solely to another nearby passenger.

<u>Infante-Ruiz, 13 F.3d at 505</u>.

b.   Authority to consent.

The underlying, but not argued, premise of the government's position is that the general consent provided by Dominick DiGiorgio, the driver, allowed Trooper Hazard to search the entire vehicle and all of its contents, irrespective of whether Christopher DiGiorgio had a superior interest in the duffel bag and never consented to the search.  Simply stated, according to the government, Dominick DiGiorgio's consent to search the vehicle provided a valid consent to search Christopher DiGiorgio's bag.

"For a third-party consent to a warrantless police search to be legally effective, the consenting party must have actual or

23

apparent authority to give the consent." U.S. v. Miller, 152
F.3d 813, 815 (8th Cir. 1998).

>  Valid third party consent can arise either through the
>  third party's actual authority or the third party's
>  apparent authority.  A third party has actual authority
>  to consent to a search if that third party has either
>  (1) mutual use of the property by virtue of joint
>  access, or (2) control for most purposes. . . . [A]
>  third party has apparent authority to consent to a
>  search when an officer reasonably, even if erroneously,
>  believes the third party possesses authority to
>  consent.

U.S. v. Chavez Loya, 2008 WL 2277553, at *7 (June 5, 2008, 8th
Cir. 2008) (quoting United States v. Andrus, 483 U.S. 711, 716
(10th Cir. 2007)).  The police cannot "rely on a third party's
consent to 'intentionally bypass' a person who is present and has
a superior privacy interest in property to be searched. U.S. v.
Brokaw, 985 F.2d 951, 953 -954 (8th Cir. 1993).  See also,
Georgia v. Randolph, 547 U.S. 103, 122-123 (2006)(holding police
may conduct a valid warrantless search of a residence if one
occupant consents, but if the co-occupant is physically present
and expressly refuses consent, the refusal is dispositive as to
the co-occupant).

"[T]he relevant inquiry is whether the facts available would
have justified a reasonable officer in the belief" that the
consenting party had authority over the property to be searched.
Chavez Loya, 2008 WL 2277553 at *7 (quoting U.S. v. Czeck, 105
F.3d 1235, 1239 (8th Cir. 1997)).

>  As with other factual determinations bearing upon
>  search and seizure, determination of consent to enter
>  must be judged against an objective standard:  would
>  the facts available to the officer at the moment
>  warrant a man of reasonable caution in the belief that

the consenting party had authority over the premises? Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

Illinois v. Rodriguez, 497 U.S. 177, 188-189 (1990).

If the authority to consent is unclear, the responsibility to resolve that ambiguity lies with the officer requesting consent. "The government cannot establish that its agents reasonably relied upon a third party's apparent authority over property to justify search of that property if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." U.S. v. Waller, 426 F.3d 838 (6th Cir. 2005). "If the agents do not learn enough, or if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, 'then warrantless entry is unlawful without further inquiry.'" U.S. v. Whitfield, 939 F.2d 1071, 1075 (D.C. Cir. 1991)(quoting Rodriguez, 497 U.S. at 189)) and holding the officer's superficial and cursory questioning of the defendant did not disclose sufficient information to support a reasonable belief that she had the authority to permit the search). See also, Montville v. Lewis, 87 F.3d 900, 903 (7th Cir. 1996)("Rodriguez imposes on law enforcement officers a duty to inquire further as to a third party's authority to consent to a search if the surrounding circumstances make that person's authority questionable.").

A valid consent to search closed luggage "must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes." Waller, 426 F.3d at 845. Before the search began, Trooper Hazard was told the

defendants each had luggage in the trunk, and that the suitcase
belonged to Dominick DiGiorgio, and the duffel bag belonged to
Christopher DiGiorgio.  When Trooper Hazard opened the vehicle
trunk at the outset of his search, he found a suitcase and a
duffel bag, both of which were closed.  Based on the totality of
the evidence, the government has failed to show that Christopher
and Dominick DiGiorgio mutually used the duffel bag, or that
Dominick DiGiorgio had "common authority" or "control" over, or
"joint access" to his brother's duffel bag.  Dominick DiGiorgio
did not have actual authority to consent to the search of the
duffel bag.  Waller, 426 F.3d at 845-46 (holding defendant had a
reasonable expectation of privacy in his zipped, closed suitcase
stored at his friend's apartment, and the friend lacked actual
authority to grant consent to search where the friend did not
have permission to open the luggage and the luggage contained not
only illegal firearms but the defendant's personal toiletries);
U.S. v. Welch, 4 F.3d 761, 764 (9th Cir. 1993)(one occupant of
rental car had no authority to consent to search of another
occupant's purse where there was no evidence of joint access to
or shared control over the purse).  The fact that Christopher
DiGiorgio's bag was located in the trunk of a car in which he was
a passenger is insufficient to show that Dominick DiGiorgio
"mutually used and had joint control" over the bag.  U.S. v.
Jaras, 86 F.3d 383, 389 (5th Cir. 1996).

     The remaining question is whether Dominick DiGiorgio had
apparent authority to search the duffel bag.  Although on notice
that each defendant had luggage in the trunk, and further told by
Dominick DiGiorgio that the duffel bag in the trunk was
Christopher DiGiorgio's, Trooper Hazard never asked Christopher
DiGiorgio whether he owned the duffel bag, or if Dominick
DiGiorgio had permission to use or consent to the search of the

26

bag.  Based on the circumstances, a reasonable officer would have
known that Dominick DiGiorgio did not have authority to consent
to search the duffel bag, or at the very least, would have
questioned whether Dominick DiGiorgio had such authority.
Dominick DiGiorgio lacked actual or apparent authority to consent
to the search of the duffel bag.  Infante-Ruiz, 13 F.3d at 504-05
(holding that where the driver granted permission to search the
trunk, but thereafter advised the officer that the briefcase in
the trunk belonged to the passenger, the driver's authority to
consent to the search of the briefcase was, at the very least,
ambiguous and the officer could not reasonably rely on the
driver's consent alone); Jaras, 86 F.3d 383 (holding a
defendant's consent to search the car did not include consent to
search a passenger's suitcase found in the trunk where the
defendant told the police that the suitcase belonged to the
passenger); U.S. v. Poulack, 82 F. Supp. 2d 1024, 1037 (D. Neb.
1999)(holding a defendant who rented a vehicle lacked apparent
authority to consent to the passenger's boxes within the truck
where the officer was told the boxes belonged to the passenger).

    Citing U.S. v. Elam, 441 F.3d 601, 604 (8th Cir. 2006), U.S.
v. Siwek, 453 F.3d 1079, 1085-86 (8th Cir. 2006), U.S. v.
Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2005), and U.S. v.
Coney, 456 F.3d 850, 858 (8th Cir. 2006), the government argues
that Christopher DiGiorgio implicitly consented to the search of
the duffel bag because, although he was never asked, he did not
state that the officer could not search the duffel bag and he sat
silently while the search was conducted.  The cases cited by the
government do not support its argument.

    First, in each case cited, the officer had received a
knowing and voluntary consent to search from someone actually or

27

apparently authorized to give such consent.  See e.g., Elam, supra. (tenant with apparent authority consented to the search of defendant's gun cabinet located in the leased premises); Siwek, supra. (the defendant, the owner and sole occupant of the vehicle, granted consent to search); Meza-Gonzalez, supra. (a resident of the property granted consent to search); Coney, supra. (a passenger consented to the search of the van he had rented).  The question presented in Siwek, Meza-Gonazalez, and Coney was whether the person expressing consent did so knowingly and voluntarily as evidenced by his silence during the search, and/or whether the consenting party did or could have revoked his consent while the search was being conducted.

The government's argument is that even if the officer never received consent to search from someone with either actual or apparent authority to grant consent, the silence or acquiescence of the person with actual authority to consent can be interpreted as an implied consent to search.  Although the defendant's expression of consent "can be inferred from words, gestures, and other conduct," (U.S. v. Jones, 254 F.3d 692, 695 (8th Cir. 2001)), the government has cited no case stating that consent to search can, in the first instance, be inferred from the silence of a defendant who was never asked.  Elam is the only case cited that broaches this subject.  Elam is distinguishable.

In Elam, a tenant had consented to the search of property he leased, and he handed the searching officer a key to the gun cabinet owned by the defendant and located in the leased premises.  The tenant did not tell the officer that the defendant owned the cabinet, and the defendant watched in silence while the cabinet was opened.  Under these facts, Elam held that the officer had no reason to believe the defendant had a superior

28

interest in the cabinet.  The officer was reasonable in believing the tenant had authority to consent, and the defendant's presence and silence during the search of his gun cabinet served to confirm rather than refute that belief.

Unlike the facts in Elam, Trooper Hazard acknowledged during his testimony that he knew the defendants each had luggage in the trunk, and based on the traffic stop recording, the officer was told the duffel bag was Christopher DiGiorgio's.  Despite this knowledge, the officer asked Dominick DiGiorgio for consent, but not in Christopher DiGiorgio's presence; he deferred speaking to Christopher DiGiorgio in response to this defendant's request for an explanation; and the officer never asked Christopher DiGiorgio for consent to search the duffel bag, or even if the bag was in fact his.  An officer seeking the legal right to search must take the initiative to obtain a valid consent to search from someone authorized to grant consent.  An officer cannot skip or overlook the requirement of asking for consent from the person with actual or apparent authority to grant consent, and then claim consent can be inferred or implied from that defendant's acquiescence or silence during the search.

Even assuming silence could constitute an expression of consent, Christopher DiGiorgio did not fail to take reasonable measures to stop the search.  Christopher DiGiorgio tried to speak with the officer about the search before it began, but was directed to sit in the patrol vehicle.  Once in the patrol vehicle, he could watch the search, but he was locked in and could not exit.  There is no evidence that Christopher DiGiorgio understood the officer's vehicle search included the contents of the bags in the trunk even after speaking with his brother in the patrol vehicle.  Ex. 2, 19:41:57-42:00.  Less than twenty seconds

29

later, the trunk was opened, and only a few seconds after that,
Christopher DiGiorgio's bag was searched.  Although Christopher
DiGiorgio may theoretically have been able to instruct his
brother to convey an objection to Trooper Hazard, less than forty
seconds elapsed from the time Christopher DiGiorgio entered the
officer's patrol vehicle until the officer found illegal drugs in
the duffel bag.  In the few seconds between the opening of the
trunk and the search of his duffel bag, Christopher DiGiorgio had
no reasonable opportunity to object to the search, and he did not
impliedly consent by failing to stop the officer before the
duffel bag was opened.

The trooper never advised Christopher DiGiorgio that he was
going to search his duffel bag; Christopher Digiorgio could not
have known that was going to occur before it happened.  With no
information being made available to Christopher DiGiorgio during
the search, he could not have "knowingly" consented by silence to
the search.

For all the foregoing reasons, I find that Trooper Hazard
failed to obtain a valid consent to search the duffel bag from
someone with actual or apparent authority to grant consent.
Therefore, unless there was probable cause to believe the duffel
bag contained evidence of criminal activity, Trooper Hazard's
warrantless search of the bag violated the Fourth Amendment.

    3.    Probable Cause.

The government claims that even if the officer received no
valid consent, Trooper Hazard had probable cause to search the
duffel bag.  The government's argument, set forth hereafter in
its entirety, is as follows:

> Lastly, the United States would argue that once Trooper
> Hazard had valid consent to search the vehicle and
> opened the trunk to begin his search he smelled a
> strong chemical odor emitting from the bag.  (Tr.
> 13:15-17, 35:1-3).  The United States believes the
> suspicious odor emanating from the bag would result in
> probable cause to search.  United States v. Lindsey,
> 158 Fed. Appx 757, 758, 2005 WL 3440790 (8th Cir.
> 2005).

Filing 40, p. 4.

Under the "automobile exception," an officer can "search a
vehicle without a warrant if he has probable cause to believe the
vehicle contains evidence of criminal activity."  U.S. v. Hill,
386 F.3d 855, 858 (8th Cir. 2004).  Probable cause may exist if
the officer detects and identifies the odor of illegal drugs in a
vehicle.  See, Lindsey, 158 Fed. Appx. 757, 758, 2005 WL 3440790,
1 (8th Cir. 2005)(holding the officer had probable cause to
search a vehicle where the officer detected the odor of marijuana
and other chemicals in the vehicle).  See also, U.S. v.
Serrano-Lopez, 366 F.3d 628, 632 (8th Cir. 2004)(holding probable
cause arose when the trooper could smell what he recognized as
the distinct odor of methamphetamine); Kleinholz v. U.S., 339
F.3d 674, 677 (8th Cir. 2003)("[L]aw enforcement smelled ether:
a substance known to be used in the manufacture of
methamphetamine. . . .  The smell of ether might alone support a
finding of probable cause."); U.S. v. Clayton, 210 F.3d 841, 845
(8th Cir. 2000)(finding the officer "developed probable cause for
a search based on his immediate perception of an odor associated
with methamphetamine production"); U.S. v. Wagner  884 F.2d 1090,
1094 (8th Cir. 1989)(holding probable cause existed where the
officer detected a strong chemical odor that he associated with
the manufacture of methamphetamine).

31

However, a "chemical odor" alone does not establish probable cause unless it is shown that the odor is "sufficiently distinctive to identify a forbidden substance." Johnson v. U.S., 333 U.S. 10, 13 (1948). Under Johnson, the detection of an odor can give rise to sufficient probable cause to search if: (1) the officer was qualified to know and recognize the odor and was able to identify it, and 2) the odor is sufficiently distinctive to identify it as a forbidden substance or activity. U.S. v. Sweeney 688 F.2d 1131, 1137 (7th Cir. 1982). An unidentified chemical smell emanating from an unlabelled piece of luggage is not, by itself, sufficient to create probable cause. The officer must to be able to link the smell to a particular controlled substance or illegal activity, and there must be some showing that he is qualified to do so. U.S. v. Little, 18 F.3d 1499, 1506 (10th Cir. 1994).

Trooper Hazard was not asked and provided no testimony explaining his background or experience in detecting the odor of illegal drugs or the precursor chemicals used in their production. He did not explain the chemical odor he smelled in the defendants' trunk, and he did not testify that this odor was distinctive or identifiable to illegal activity. As such, the government has not shown that the presence of the chemical odor in the defendants' trunk, standing alone, created sufficient probable cause to search the duffel bag. Little, 18 F.3d at 1506 (holding that although the DEA agent detected "a chemical odor coming from the bag," the bag was unlawfully held where the officer "could not identify the odor, nor could he associate it with a particular drug or drug-related activity"); U.S. v. DeLeon, 979 F.2d 761, 764-65 (9th Cir. 1992)(holding a warrant application, when corrected as required under Franks, failed to support probable cause to search where the affiant officer stated

32

he smelled marijuana but the affidavit failed to set forth the officer's qualifications to recognize this odor); U.S. v. McKneely, 810 F. Supp. 1537, 1546 (D. Utah 1993), rev'd on other grounds, 6 F.3d 1447, 1456 (10th Cir. 1993)(holding that despite the officer's extensive experience, his inability to identify the "chemical smell" he detected rendered the odor ineffective to support probable cause).

An unidentified chemical odor can, however, be considered in assessing the totality of facts supporting a finding of reasonable suspicion or probable cause.  See e.g., U.S. v. Nanos, 209 Fed. Appx. 604, 606, 2006 WL 3623137, 2 (8th Cir. 2006) (finding reasonable suspicion based, in part, on the "inexplicable presence of a strong chemical odor").  "The requirement that an [officer] report his olfactory qualifications and designate a specific chemical odor has been applied only in situations in which odors are the sole factor establishing probable cause." U.S. v. Kuntz, 504 F. Supp. 706, 710 (D.C.N.Y. 1980).  The presence of a strong chemical odor is afforded less weight when the officer does not or cannot identify the odor as consistent with a specific illegal substance or illegal activity. "However, an unexplained strong caustic[4] chemical smell emanating from a vehicle may support a general suspicion that the occupant is transporting illegal materials of some form.  Coupled with other factors, it could amount to probable cause." U.S. v. Douglas, 195 Fed. Appx. 780, 786, n. 8, 2006 WL 2642129, 4 (10th Cir. 2006)(finding reasonable suspicion existed to detain a vehicle's occupants awaiting a canine based on the passengers' unusual travel itinerary, travel from a known drug-source city, inability to provide details about the trip, the inexplicable

---

    [4] There is no evidence here that the "chemical odor" was "caustic."

33

presence of a strong chemical odor, the presence of masking
agents, and the passenger's criminal record and increasingly
confrontational attitude during the traffic stop).

The government has not cited, and the court has not found,
any case supporting the government's conclusory argument that
"the suspicious odor emanating from the bag would result in
probable cause to search." Filing 40, p. 4. The undersigned has
assessed the facts known to the officer prior to opening the
duffel bag and, considered in the totality, finds the officer
lacked probable cause to conduct a warrantless search of the
duffel bag.

Though not elicited as testimony at the hearing, based on
the in-car camera recording, the defendants provided somewhat
divergent descriptions of their trip itinerary and purpose, and
Christopher DiGiorgio had some unexplained criminal history. In
addition, Trooper Hazard testified that there was a strong
chemical smell emanating from the duffel bag when he opened the
trunk. However, the officer was not asked and provided no
testimony describing any other facts that he believed were
indicative of illegal drug activity. For example, neither
defendant was reportedly nervous or anxious, there was no
testimony describing the defendants' trip itinerary, origin, or
destination as indicative of illegal drug transport, and there
was no testimony describing masking agents, unusual luggage, or
any suspicious disarray or contents seen in the vehicle's
passenger compartment.

The facts known to Trooper Hazard prior to opening the
duffel bag provided reasonable suspicion to detain the vehicle,
perhaps to await the arrival of a drug dog if one was available,

but those facts did not rise to the level of probable cause to
believe a crime was being committed.  Trooper Hazard's search of
the duffel bag in the trunk of the defendants' vehicle violated
the Fourth Amendment.  The evidence derived from this search
should be suppressed.


IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard
G. Kopf, United States District Judge, that:

a.  Defendant Dominick DiGiorgio's motion to suppress,
    filing 18, be denied.

b.  Defendant Christopher DiGiorgio's motion to suppress,
    filing 20, be denied to extent that it seeks
    suppression of evidence based on the allegedly illegal
    traffic stop, and that the motion be granted in all
    other respects.

The parties are notified that a failure to object to this
recommendation in accordance with the local rules of practice may
be held to be a waiver of any right to appeal the district
judge's adoption of this recommendation.


DATED this 19th day of June, 2008.

BY THE COURT:

s/ David L. Piester

David L. Piester
United States Magistrate Judge

35